LAW + BRANDMEYER LLP
JACOB ROSENBERG 327598
JROSENBERG@LAWBRANDMEYER.COM
385 E. COLORADO BLVD.
SUITE 200
PASADENA, CALIFORNIA 91101
626.243.5500

POWERS PYLES SUTTER & VERVILLE, PC
Matthew S. Freedus (admitted *pro hac vice*)
1250 Connecticut Avenue, NW, Eighth Floor
Washington, DC 20036
202.466.5660

*Attorneys for Defendant Ian B. Tilley, M.D.*

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAIZEL BLUMBERGER,<br><br>                    *Plaintiff*,<br><br>    vs.<br><br><br>CALIFORNIA HOSPITAL MEDICAL CENTER, IAN B. TILLEY, M.D., *et al.*,<br><br>                    *Defendants*. | No.: 2:22-cv-06066-FLA (JCx)<br><br>**DEFENDANT TILLEY'S OPPOSITION TO THE UNITED STATES'S AND PLAINTIFF'S MOTIONS TO REMAND**<br><br>*[Declaration of Matthew S. Freedus; filed herewith]*<br><br>Hearing Date: July 11, 2025<br>Hearing Time: 1:30 p.m.<br>Ctrm: 6B<br><br>Honorable Fernando L. Aenlle-Rocha<br>United States District Judge |

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

STATUTORY AND REGULATORY BACKGROUND.......................................2

FACTUAL AND PROCEDURAL BACKGROUND ...........................................6

LEGAL STANDARD.............................................................................................8

ARGUMENT ..........................................................................................................9

    I.  Dr. Tilley is Immune under § 233(a)..........................................................9

        A.  Dr. Tilley Was Deemed To Be A PHS Employee During The
           Relevant Period For All Medical And Related Functions He
           Performed .......................................................................................10

        B.  Dr. Tilley Acted Within the Scope of His Employment And In
           Furtherance Of Eisner's Federal Project .........................................11

        C.  No Particularized Determination Was Required.............................15

    II. Dr. Tilley Acted Under A Federal Officer Within The Meaning Of §
      1442(A)(1) And Timely Removed Under § 1446(B)(3)........................17

CONCLUSION .....................................................................................................21

## TABLE OF AUTHORITIES

**Federal Cases**

*Blumberger v. Tilley*,
115 F.4th 1113 (9th Cir. 2024) ....................................................*passim*

*Bulji v. Tyson Foods*,
22 F.4th 730 (8th Cir. 2021) ..............................................................20

*City & Cnty. of Honolulu v. Sunoco LP*,
39 F.4th 1101 (9th Cir. 2022) ...........................................................18

*Colorado v. Symes*,
286 U.S. 510 (1932) .............................................................................9

*Demers v. Buonanno*,
2012 WL 5930223 (D.R.I. Nov. 2, 2012) ...........................................20

*Dietrich v. Boeing Co.*,
14 F.4th 1089 (9th Cir. 2021) ...........................................................17

*Doe v. Cedars-Sinai Health Sys.*,
106 F.4th 907 (9th Cir. 2024) ...........................................................20

*Durham v. Lockheed Martin Corp.*,
445 F.3d 1247 (9th Cir. 2006) .............................................................9

*Friedenberg v. Lane County*,
68 F.4th 1113 (9th Cir. 2023) ...................................................*passim*

*Hui v. Castaneda*,
559 U.S. 799 (2010) .......................................................................1, 11

*In re Joliet-Will Cnty. Cmty. Action Agency*,
847 F.2d 430 (7th Cir. 1988) .............................................................18

*Kashin v. Kent*,
457 F.3d 1033 (9th Cir. 2006) .......................................................8, 11

*Krandle v. Refuah Health Ctr., Inc.*,
No. 22-cv-4977, 2024 WL 1075359 (S.D.N.Y. Mar. 12, 2024) ..........9

*McLachian v. Bell*,
   261 F.3d 908 (9th Cir. 2001) ................................................................9

*Pediatric and Fam. Med. Found. v. Becerra,* 2021 WL 3878647 (9th
   Cir. Aug. 31, 2021) ................................................................6, 14

*Pediatric and Fam. Med. Found. v. U.S. Dep't. of Health and Hum.
   Servs.*,
   No. 17-cv-00732 (C.D. Cal.) ................................................................7

*Stoker v. United States*,
   2022 WL 2452304 (9th Cir. July 6, 2022) ................................................9

*United States v. Smith*,
   499 U.S. 160 (1991) ................................................................9

*Watson v. Philip Morris Cos.*,
   551 U.S. 142 (2007) ................................................................9

**Federal Statutes**

28 U.S.C. § 1346(b) ................................................................8, 13

28 U.S.C. § 1442(a)(1) ................................................................*passim*

42 U.S.C. § 233(a) ................................................................*passim*

42 U.S.C. § 233(g) ................................................................9

42 U.S.C. § 233(g)(1)(A) ................................................................5, 10

42 U.S.C. § 233(g)(1)(D) ................................................................6

42 U.S.C. § 233(g)(4) ................................................................2

42 U.S.C. § 233(g)(5)(B) ................................................................13

42 U.S.C. § 233(h) ................................................................6, 16

42 U.S.C. § 233(j) ................................................................13

42 U.S.C. § 233(*l*)(2) ................................................................13

42 U.S.C. § 254b ................................................................2, 6

iv

42 U.S.C. § 254b(a) ....................................................................................................2

42 U.S.C. § 254b(a)(1) ..........................................................................................7, 12

42 U.S.C. § 254b(b)(1) ..................................................................................2, 7, 12, 21

42 U.S.C. § 254b(e)(5) ...............................................................................................13

42 U.S.C. § 254b(e)(5)(D) ..........................................................................................21

42 U.S.C. § 254b(k)(3)(G)(iii) ......................................................................................7

Federally Supported Health Centers Assistance Act of 1992, Pub. L.
    No. 102-501, 106 Stat. 3268 (1992) ....................................................................4

Federally Supported Health Centers Assistance Act of 1995, Pub. L.
    No. 104-73, 109 Stat. 777 (1995) ........................................................................5

Pub. L. No. 91-623, 84 Stat. 1870 (1970) ..................................................................19

**Regulations**

42 C.F.R. § 6.6 .............................................................................................2, 12, 13

42 C.F.R. § 6.6(d) .......................................................................................................12

42 C.F.R. § 51c.102(e) .........................................................................................2, 13

45 C.F.R. § 2.1(a) .......................................................................................................20

45 C.F.R. § 2.2(4) .......................................................................................................20

60 Fed. Reg. 22530-01 (May 8, 1995) .........................................................................4

60 Fed. Reg. 49417 (Sept. 25, 1995) ...........................................................................5

**Other Authorities**

141 Cong. Rec. H14273-07 (1995) ...............................................................................4

HHS, Health Resources and Services Administration, *Documenting
    Scope of Project*, https://bphc.hrsa.gov/compliance/scope-
    project/documenting-scope-project ......................................................................3

HHS, Office of Inspector General, *The Perinatal Service Capacity of the Federally Funded Community Health Centers: An Overview* (Dec. 1992), https://oig.hhs.gov/documents/evaluation/1675/OEI-01-90-02332-Complete%20Report.pdf ............................................................... 8

H.R. Rep. No. 104-398, 1995 U.S.C.C.A.N. 767 ........................................................ 4

H.R. Rep. No. 102-823(I), 1992 U.S.C.C.A.N. 2627 ........................................ 18, 19

**INTRODUCTION**

Defendant Ian Tilley, M.D. is immune from Plaintiff's claims under 42 U.S.C. § 233(a), which immunizes Public Health Service employees—and those deemed equivalent by the United States Department of Health and Human Services (HHS)—from suits resulting from the performance of medical or related functions undertaken within the scope of employment. *Hui v. Castaneda*, 559 U.S. 799, 806 (2010); *Blumberger v. Tilley*, 113 F.4th 1113, 1117 (9th Cir. 2024) ("[I]mmunity for deemed PHS employees is identical to the immunity for true PHS employees."). The Court should deny the Government's and Plaintiff's motions to remand, order the substitution of the United States in place of Dr. Tilley, and deem this action as one brought under the Federal Tort Claims Act (FTCA).

This case results from labor and delivery services Dr. Tilley—an obstetrician employee of a federally-funded community health center—provided to an established patient of that center. Dr. Tilley and his employer, Eisner Pediatric and Family Medical Center (Eisner), were irrevocably deemed to be PHS employees for the period in which the alleged acts and omissions occurred. The issue before the Court is whether Dr. Tilley's alleged conduct was within the scope of his deemed federal employment. The applicable test is simple: whether Dr. Tilley acted on Eisner's behalf and in furtherance of Eisner's federal project.

Avoiding honest engagement with this framework, the United States repeatedly asserts as fact the legal conclusion it seeks to establish: that Dr. Tilley was *not* working on Eisner's behalf or within the scope of its grant-supported activities when he, an Eisner-employed obstetrician, provided required labor and delivery services to an established Eisner perinatal patient, at a health delivery site HHS expressly approved as part of Eisner's federal project. To support its preferred outcome, the Government advances a fiction—that Eisner's performance of obstetrical services constituted a "separate line of business" outside of Eisner's federal health center project. United States of America's Motion to Remand, ECF

1

No. 56 at 13 (hereinafter "U.S. Br."). The argument fails: Eisner was obligated by statute to provide the "required primary health services" at issue to "all residents" of its services area, either through its own "staff . . . or through contracts or cooperative agreements," § 254b(a), Eisner's costs in providing these services were, with HHS's full knowledge and explicit approval, "grant-supported," 42 C.F.R. § 6.6, and Dr. Tilley acted solely on Eisner's behalf in fulfilling his responsibilities to provide obstetrical care to an Eisner patient in an appropriate hospital setting.

## STATUTORY AND REGULATORY BACKGROUND

### The Section 330 Heath Center Program

Baseline eligibility for the deemed federal status and absolute immunity at issue hinges on a health center's receipt of funding under Section 330 of the PHS Act, *codified at* 42 U.S.C. § 254b. 42 U.S.C. § 233(g)(4).

By statute, HHS's approval of health center program funding is conditioned on its assessment that an applicant is a "health center," *i.e.*, that it serves a medically underserved population or area and provides required primary health care and related services to all residents of its service area. 42 U.S.C. § 254b(a), (b)(1) (defining required primary health services); 42 C.F.R. § 51c.102(e) ("Medically underserved areas will be designated by the Secretary and . . . published in the Federal Register from time to time . . . ."). Congress further required applicants for health center program funding to describe to HHS "the unmet need for health services" in the center's catchment area, establish the area "has a shortage of personal health services," and demonstrate the center is "located so that it will provide services to the greatest number of individuals residing in the catchment area." *Id.* § 254b(k)(2); *see also id.* § 254b(a)(1) (defining "catchment area" as "the area served by the center"). Outside of the statutory requirement to establish "health center" status and unmet medical need, Congress left to HHS to prescribe the "form and manner" of health center grant applications, as well as the "information" such applications must contain. § 254b(k)(1).

**DEFENDANT IAN TILLEY'S OPPOSITION TO THE UNITED STATES'S AND PLAINTIFF'S MOTIONS TO REMAND**

As implemented, HHS requests that health center applicants detail their sites, services, providers, service area, and target populations when applying for funding. *See* HHS, Health Resources and Services Administration (HRSA), *Documenting Scope of Project*, https://bphc.hrsa.gov/compliance/scope-project/documenting-scope-project. Together, these five elements form a health center's "scope of project," *i.e.*, "the activities that the total approved section 330 grant-related project budget supports, the parameters for using these grant funds, the basis for Medicare and Medicaid Federally Qualified Health Center reimbursements, Federal Tort Claims Act coverage . . . and other essential benefits." HHS, Health Resources and Services Administration (HRSA), Policy Information Notice (PIN) 2008-01 at 1 (Jan. 2009) (cautioning "proper recording of scope of project is critical in the oversight and management of programs funded under section 330 of the PHS Act").

An HHS-approved permanent service site—a key element of a health center's scope of project—is a location at which the health center's providers, either directly or through a subrecipient or established contract or cooperative agreement: conduct face-to-face visits with patients and document those encounters in the patients' medical records, exercise independent clinical judgment, and deliver services on a regular basis and on the health center's behalf, *i.e.*, under the control and authority of the health center's governing board. PIN 2008-01 at 4, 5 (noting health centers services permanent sites "may be offered either directly or through an established arrangement"). HHS calls for health centers to "record[] approved service sites on Form 5B" of HHS's standard form § 254b funding application. *See* HHS, HRSA, *Documenting Scope of Project*, https://bphc.hrsa.gov/compliance/scope-project/documenting-scope-project.

<u>The Federally Supported Health Centers Assistance Act of 1992: PHS Act</u>
<u>Immunity for Health Centers</u>

In 1992, as a three-year demonstration project, Congress enacted the Federally Supported Health Centers Assistance Act ("FSHCAA") to ensure health centers used

3

1    their funds to deliver primary care to underprivileged populations, rather than to pay

2    "costly medical malpractice insurance" premiums. *Friedenberg v. Lane County*, 68

3    F.4th 1113, 1125 (9th Cir. 2023) (citing H.R. Rep. No. 104-398, at 5 (1995)). To

4    achieve that objective, the FSHCAA of 1992 authorized HHS—"in consultation

5    with the Attorney General"—to "deem" health centers and their personnel to be PHS

6    employees for purposes of § 233(a) immunity. Pub. L. No. 102-501, § 2(a), (b).

7    During its 1992 to 1995 pilot phase, the FSHCAA program had no effective

8    or reliable process to confirm coverage for activities within a health center's grant

9    project in advance of the period for which coverage was needed. As a result, health

10   centers had significant coverage concerns around "services provided off-site and to

11   persons not registered with the Center." 60 Fed. Reg. 22530-01, 22531 (May 8,

12   1995) (recognizing health center program uses the concept of HHS-approved service

13   sites to distinguish between health center "patients" and "non-patients"). Given the

14   1992 FSHCAA's shortcomings, many health centers either chose not to participate,

15   or participated but were not "comfortable dropping their private malpractice

16   insurance." *See* 141 Cong. Rec. H14273-07, H14276 (1995).

17   <u>The FSHCAA Regulations: Purporting to Implement at Sunset</u>

18   In May 1995, in response to health centers' coverage concerns, HHS

19   promulgated a regulation purporting to "implement" the FSHCAA of 1992, on the

20   eve of its expiration. 60 Fed. Reg. 22530. The regulation provides that "[a]cts and

21   omissions related to services" to non-patients will be covered if HHS determines

22   that providing such services either: (1) benefits patients of the entity and general

23   populations that could be served by the entity through community-wide intervention

24   efforts; (2) facilitates the provision of services to patients of the entity; or (3) is

25   otherwise required under a deemed health center provider's employment contract or

26   similar arrangement. *Id.* at 22531 (providing illustrative "examples" pertaining to

27   "off-site" services). The regulation authorizes HHS, in making such a determination,

28

**DEFENDANT IAN TILLEY'S OPPOSITION TO THE UNITED STATES'S AND PLAINTIFF'S MOTIONS TO REMAND**

1  to seek "such assurances and conduct such investigations as he or she deems
2  necessary." *Id*. at 42792.

3  In September 1995, to address lingering "[q]uestions . . . about" offsite
4  services and "the process for the Secretary to make the determinations" as to whether
5  such services would be covered, HHS published a subsequent "notice" in the Federal
6  Register. *See* 60 Fed. Reg. 49417 (Sept. 25, 1995). The notice—which neither
7  purported to nor could be a rule or regulation—"provide[d] further guidance"
8  regarding the May 8, 1995 FSHCAA rule, advising health centers they: "*may apply*
9  for specific determinations of coverage" and "*may apply* for a particularized
10 [coverage] determination." *Id*. at 49418 (emphasis added).

### 1995 FSHCAA: Legislative Fixes and Program Permanency

12 On December 26, 1995, when Congress reauthorized the FSHCAA and made
13 its extension of immunity to deemed PHS personnel permanent, it made several
14 procedural modifications and clarifications designed to provide certainty and fix
15 problems identified in the 1992 legislation—including the lack of an application
16 process for deemed status and government delay in determining FTCA coverage
17 after a malpractice lawsuit has been filed. Pub. L. No. 104-73, 109 Stat. 777 (1995);
18 H.R. Rep. 104-398, *reprinted in* 1995 U.S.C.C.A.N. 767, 768, 771, 1995 WL
19 744796, *5–7 (1995). The 1995 amendments neither altered nor restricted the
20 immunity extended to deemed PHS personnel. *See* 42 U.S.C. § 233(g)(1)(A)
21 (reiterating 1992 FSHCAA command that deemed and actual PHS employees enjoy
22 "the same" immunity); *Friedenberg*, 68 F.4th 1113, 1125 (9th Cir. 2023) (rejecting
23 argument 1995 amendments extend "lesser protection to deemed PHS employees
24 under § 233(g) than [§ 233] does to actual PHS employees under § 233(a)"). The
25 amendments instead established procedures for health centers to apply to HHS to
26 receive expedited, prospective approval for malpractice coverage for a specified
27 period: a single application in a form and manner prescribed by the HHS Secretary,
28 which must contain detailed information and supporting documentation sufficient

5

for HHS to verify that the coverage would apply to all services provided by the particular health center and its providers to the center's patients (and in certain circumstances, non-patients), and demonstrate compliance with other statutory requirements. 42 U.S.C. § 233(g)(1)(D) and (h).

As implemented, the HHS-prescribed deeming application neither requires nor permits the health center to list the sites or services for which it wishes to obtain coverage. *See*, *e.g.*, HHS, HRSA, *Calendar Year 2025 Requirements for FTCA Coverage for Health Centers and Their Covered Individuals*, https://bphc.hrsa.gov/sites/default/files/bphc/data-reporting/calendar-year-2025-free-clinic-pal-2024-08.pdf (hereinafter "Deeming Application"). Instead, HHS relies on the scope of project established in a health center's application(s) for § 254b funding.

## FACTUAL AND PROCEDURAL BACKGROUND

Much of this case's procedural history—beginning with Plaintiff's filing of a May 20, 2021 action in California state court alleging negligence in, among other things, Dr. Tilley's performance of obstetrical functions—is detailed in the Ninth Circuit's September 9, 20204 decision. *Blumberger*, 115 F.4th at 1119–1121. The following facts and additional procedural background are relevant to the pending remand motions:

Dr. Ian Tilley is an obstetrician employee of Eisner Pediatric and Family Medical Center (Eisner), a federally-funded community health center whose day-to-day operations are governed by 42 U.S.C. § 254b. *Id*. at 1120. Plaintiff's action arose from labor and delivery care Dr. Tilley provided at CHMC, a location at which HHS had, for many years, approved Eisner's provision of labor and delivery services to both its own patients, like Plaintiff, and to unassigned patients in need of ob-gyn care. *See* Declaration of Matthew S. Freedus ("Freedus Decl.") ¶¶ 2, 4–5 & Ex. A (change in scope application), Ex. C (HRSA approval), Ex. D (Form 5B); *Pediatric and Fam. Med. Found. v. Becerra*, 2021 WL 3878647, at *2 (9th Cir. Aug. 31, 2021)

6

(holding HRSA's July 2015 decision to remove CHMC from Eisner's scope of project was "arbitrary and capricious"); *Pediatric and Fam. Med. Found. v. U.S. Dep't. of Health and Hum. Servs.*, No. 17-cv-00732 (C.D. Cal.), ECF No. 147 (vacating removal of CHMC from Eisner's scope of project).

In March 2007, Eisner submitted a request to HRSA to add a service site and certain medical services to its federal project. Freedus Decl. ¶ 2, Ex. A at 3–12. Eisner's request included two components: "(1) the expansion of outpatient women's health services for prenatal care, including high-risk individuals, gynecological care, and family planning at [Eisner's] main clinic site . . .; and (2) the addition of California Hospital Medical Center [CHMC] as a new site where [Eisner's] obstetrics/gynecology medical providers and nurse midwives will staff the 24-hour hospital panel." *Id*. at 7. The request informed HRSA that Eisner would "take over the obstetrics/gynecology services 24-hour hospital-based panel located at [CHMC], contractually covering labor and delivery, the emergency room, and supervising students, interns, and residents for labor and delivery and gynecological procedures. Services . . . are offered 24 hours a day, seven days each week." *Id.* HRSA approved the addition of CHMC as an Eisner service site on February 5, 2008, and added new services of high-risk prenatal care, prenatal care, and family planning to the scope of services Eisner offered under its grant project, with an effective date of March 30, 2007. Freedus Decl. ¶ 4, Ex. C.

Eisner and its personnel—including Dr. Tilley—held "final and binding" deemed PHS employee status when the events underlying this action occurred. *Blumberger*, 115 F.4th at 1118, 1120. Eisner's HHS-approved service area includes South Los Angeles. Freedus Decl. ¶ 2, Ex. A at 7, 9–11; 42 U.S.C. § 254b(a)(1), (k)(3)(G)(iii). Eisner's health center project includes, as required by statute, the provision of prenatal, perinatal, obstetrical, and gynecological care, 42 U.S.C. § 254b(b)(1), with a particular focus on the significant unmet maternal and infant health needs in its service area. *Id.*; *see also* HHS, Office of Inspector General, *The*

*Perinatal Service Capacity of the Federally Funded Community Health Centers: An Overview* (Dec. 1992), https://oig.hhs.gov/documents/evaluation/1675/OEI-01-90-02332 Complete%20Report.pdf, ("Community health centers . . . play an important role in reducing infant mortality by delivering comprehensive perinatal care to high-risk women in medically underserved areas across the nation.").

Approximately one year after the United States was advised of Plaintiff's suit, on July 21, 2022, an Assistant United States Attorney "misleadingly advised the state court that Dr. Tilley was '*not* deemed to be an employee of the Public Health Service for purposes of 42 U.S.C. § 233 with respect to the actions or omissions that are the subject of the above captioned action.'" *Blumberger*, 115 F.4th at 1134. On August 26—twenty-eight days after receiving notice of the Attorney General's inaccurate notice—Dr. Tilley removed this matter to this Court. *Id.*

On September 9, 2024, the Ninth Circuit vacated this Court's November 2, 2022 remand order; reversed the Court's conclusions as to removal jurisdiction; and remanded with instructions to assess the timeliness of Dr. Tilley's 28 U.S.C. § 1442 removal under § 1446(b)(3), evaluate whether he was acting under a federal officer within the meaning of § 1442(a)(1), and decide the merits of his immunity defense, *i.e.*, whether he was acting within the scope of his deemed PHS employment when performing the medical functions at issue. *Blumberger*, 115 F.4th at 1140.

## LEGAL STANDARD

"The law applicable to determine whether a government employee was acting with the scope of employment is the law of the place where the act or omission occurred." *Kashin v. Kent*, 457 F.3d 1033, 1037 (9th Cir. 2006) (citing 28 U.S.C. § 1346(b)(1)); *see Agyin*, 986 F.3d at 184 (applying New York state law to determine whether deemed PHS defendant acted within the scope of his employment for § 233(a)). Under California law, "an employee acts within the scope of employment when: (1) the challenged act was required by or broadly incidental to the employee's duties; or (2) the employer reasonably could have foreseen the employee's conduct."

8

1     *Stoker v. United States*, 2022 WL 2452304, *1 (9th Cir. July 6, 2022) (*citing*

2     *Sunderland v. Lockheed Martin Aeronautical Sys. Supp. Co.*, 130 Cal. App. 4th 1, 9

3     (2005)). "Employee activity falls within the course and scope of employment when,

4     in the context of the particular enterprise, an employee's conduct is not so unusual

5     or startling that it would seem unfair to include the loss resulting from it among other

6     costs of the employer's business." *Id.* (citing *Farmers Ins. Group v. County of Santa*

7     *Clara*, 11 Cal. 4th 992, 1003 (1995)); *see McLachian v. Bell*, 261 F.3d 908, 912 (9th

8     Cir. 2001) (scope of employment is "interpreted broadly").[1]

9        Whether a person was acting under a federal officer within the meaning of 28

10    U.S.C. § 1442(a)(1) is likewise broadly interpreted. *See Colorado v. Symes*, 286 U.S.

11    510, 517 (1932) ("It scarcely need be said that such measures [allowing for federal

12    officer removal] are to be liberally construed to give full effect to the purposes for

13    which they were enacted."); *accord Watson v. Philip Morris Cos.*, 551 U.S. 142, 147

14    (2007) (collecting cases and observing "this Court has made clear that the statute

15    must be 'liberally construed'") (citation omitted); *Agyin*, 986 F.3d at 175 ("[B]oth §

16    1442 and especially its 'acting under' provision must be read broadly."). The Ninth

17    Circuit "extend[s] section 1442's liberal interpretation to section 1446" procedures.

18    *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1252–53 (9th Cir. 2006)

19    (reiterating "we are to interpret section 1442 broadly in favor of removal").

20                             **ARGUMENT**

21    **I.  Dr. Tilley is Immune under § 233(a)**

22        Dr. Tilley is entitled to absolute immunity from Plaintiff's claims under 42

23    U.S.C. § 233(a) and (g), which together immunize deemed PHS employees from any

24

25    [1] The Government's assertion that the court "must" in its analysis of Dr. Tilley's
immunity "consider the limited nature of the FTCA's waiver of sovereign

26    immunity" conflates the scope of the statutory immunity right at issue with the scope
of the FTCA remedy. The two are entirely distinct. *Krandle v. Refuah Health Ctr.,*

27    *Inc.*, No. 22-cv-4977, 2024 WL 1075359, at *7 (S.D.N.Y. Mar. 12, 2024) ("The
scope of the FTCA—and the scope of the United States' waiver—is a separate

28    question which § 233 says nothing about.") (citing *United States v. Smith*, 499 U.S.
160, 162 (1991)).

civil action or proceeding resulting from the performance of medical or related functions, so long as the allegedly wrongful conduct underlying the claim was within the scope of the defendant's deemed federal employment. 42 U.S.C. § 233(a). Each element required for § 233(a) immunity is met: Dr. Tilley, pursuant to his employment agreement with Eisner—a deemed health center—was fulfilling Eisner's statutory obligations to provide required medical services and ensure continuity of care for an established Eisner patient at an HHS-approved service delivery site.

### A. Dr. Tilley Was Deemed To Be A PHS Employee During The Relevant Period For All Medical And Related Functions He Performed

There is no dispute that Dr. Tilley was deemed to be a federal employee during the year in which Plaintiff's action arose. *Blumberger*, 115 F.4th at 1120. The relevant deeming notice expressly confirms that, for any action based on acts or omissions that occurred in 2018, Eisner and its employees have irrevocable "liability protection . . . for damage for personal injury, including death, resulting from the performance of medical . . . or related functions . . . while acting within the scope of such employment." ECF 1-2 (Notice of Deeming Action for 2018).

Plaintiff and the Government argue for a narrowing of the reach and scope of immunity Dr. Tilley's deemed status affords. *See, e.g.,* U.S. Br. at 13. The arguments are without merit. The immunity granted to deemed defendants is, by unequivocal statutory mandate, "the same" immunity from suit to which "any commissioned officer or employee of the Public Health Service" is entitled. 42 U.S.C. § 233(a), (g)(1)(A); *accord Friedenberg,* 68 F.4th at 1127 ("Congress intended for deemed PHS employees to receive protection 'in the same manner' as traditional PHS employees during the coverage period."); *Blumberger,* 115 F.4th at 1117 (describing immunity afforded to actual and deemed PHS employees as "identical") (citing 42 U.S.C. § 233(g)(1)(A)). That immunity shields the performance of all medical and

10

related functions undertaken within the scope of employment. *Blumberger*, 115 F.4th at 1117 (citing § 233(a) and *Hui*, 559 U.S. at 806). Nothing in the FSHCAA's text, purpose, or history "suggest[s] that Congress intended to limit the scope of protection by enacting § 233(g)." *Friedenberg,* 68 F.4th at 1126–27 ("Sections 233(g)(1)(B) and (C) were enacted to clear up such confusion ["on whether certain services would be covered, such as services provided to non-patients"], not to limit the protection afforded to deemed PHS employees."). Indeed, the Ninth Circuit, *in this case*, reiterated "[t]he immunity for deemed PHS employees is identical to the immunity for true PHS employees." *Blumberger*, 115 F.4th at 1117; *see also Agyin*, 986 F.3d at 177 (concluding deemed PHS physician "received from the federal government a delegation of the same legal immunity that is extended to employees of the Public Health Service").

## B. Dr. Tilley Acted Within The Scope Of His Employment And In Furtherance Of Eisner's Federal Project

The acts and omissions at the heart of Plaintiff's complaint occurred within the scope of Dr. Tilley's deemed federal employment: Plaintiff's action results from Dr. Tilley's performance, at an approved site, of medical functions Eisner was required to provide as part of its HHS-approved federal project.

First, there should be no dispute that Dr. Tilley, with respect to the factual allegations in Plaintiff's complaint, was acting within the scope of his Eisner employment. The applicable framework for the inquiry is "the law of the place," *i.e.*, the *respondeat superior* law of the state where the alleged injury occurred. *Kashin*, 457 F.3d at 1037; *Agyin*, 986 F.3d at 184. Here, that law is California's, under which an employer is liable for risks "arising out of the employment," *i.e.*, risks "that may fairly be regarded as typical of or broadly incidental to the enterprise undertaken by the employer." *Perez v. Van Groningen & Sons, Inc.*, 719 P.2d 676, 678–79 (Cal. 1986). Dr. Tilley, an Eisner-employee obstetrician providing care for an established Eisner patient, was performing required medical functions on Eisner's behalf at a

11

hospital location HHS had approved as a permanent delivery site for obstetrical and gynecological services. Freedus Decl. ¶ 2, 4-5, Ex. A, C, D; Chapman Decl., Ex. A at 1 (establishing Plaintiff received prenatal care at Eisner). That Dr. Tilley provided labor and delivery services at a hospital, rather than at a health center ambulatory site, is irrelevant to the scope of employment analysis. Nothing in the record suggests Dr. Tilley was "moonlighting" or working for anyone other than Eisner when he provided care to Plaintiff; and it unremarkable that a hospital, rather than Eisner's outpatient ambulatory locations, is where Dr. Tilley performs obstetrical services.

Second, the obstetrical and gynecological functions Eisner personnel performed at CHMC for Eisner patients like Plaintiff—and for unassigned labor and delivery patients—were, at minimum, "related to grant-supported activity" within the meaning of 42 C.F.R. § 6.6(d), and thus within the activities for which Eisner is deemed to be a federal employee; *see Friedenberg*, 68 F.4th 1130–31 ("Under 42 C.F.R. § 6.6, '[o]nly acts and omissions related to the grant-supported activity of entities are covered' even if the other requirements for immunity under § 233 have been met.").

Dr. Tilley's alleged acts and omissions occurred during the provision of services his health center employer is required by statute to provide to "all residents of the area served by the center." 42 U.S.C. § 254b(a)(1), (b)(1) (requiring health centers provide "health services related to obstetrics [and] gynecology" and "perinatal services"). Eisner's health center status—the baseline requirement for it to be deemed a PHS employee—is conditioned on its provision of this care. Congress further conditioned approval of health center program funding applications on the center's ability to ensure continuity of care for its patients, including by requiring HHS to determine "the center has made and will continue to make every reasonable effort to establish and maintain collaborative relationships with other health care providers, including other health care providers that provide care within the catchment area, local hospitals, and specialty providers in the catchment area of

12

1   the center, to provide access to services not available through the health center." *Id.*
2   § 254b(k)(3).

3        Beyond merely satisfying statutory requirements applicable to all health
4   centers, Eisner has long made meeting unmet maternal and infant health needs in
5   downtown Los Angeles a significant focus of its HHS-approved federal project,
6   including during the relevant period. Freedus Decl. ¶ 2, 4 Ex. A (describing target
7   unmet medical needs of target population), C (HRSA approval); *see also* 42 U.S.C.
8   § 233(g)(1)(B), (g)(5), (j); 42 C.F.R. § 51c.102(e) (listing factors informing HHS's
9   designation of medically underserved areas as including, *inter alia*, "appropriate
10  ratios of primary care physicians in . . . obstetrics and gynecology to population [and]
11  [h]ealth indices for the population of the area, such as infant mortality rate"); see
12  also 42 U.S.C. § 233(g)(5)(B), (j) (contemplating coverage of "services in the fields
13  of . . . obstetrics and gynecology" including inpatient services).

14       The Government misses the mark in arguing that Eisner's receipt of payment
15  under its contract with CHMC carved Eisner's patient care at that approved service
16  site from the scope of its "grant-supported" activity. A health center activity is
17  "grant-supported," and thus within a health center's scope of project, if HHS
18  approves the health center's use of federal grant funds and/or other funding (*e.g.*,
19  revenue generated through its operations) to cover the activity's reasonable costs.
20  *Id.* (A health center's "total budget" includes the Health Center Program federal
21  award funds and all other sources of revenue in support of the health center scope of
22  project."); 42 U.S.C. § 254b(e)(5)(A), (D) (all income must be used to further
23  objectives of health center's federal project). Whether an activity is "grant-
24  supported" is an aspect of the scope of employment inquiry the statutes demand. *See*
25  42 U.S.C. § 233(a), (*l*)(2); 28 U.S.C. § 1346(b); *Agyin*, 986 F.3d at 184 ("[N]either
26  42 C.F.R. § 6.6 nor the FTCA Manual purports to alter [the state law] scope-of-
27  employment analysis. Indeed, neither the regulation nor the manual would be able to
28  alter the application of that state-law test."). HHS itself advances this view in

**DEFENDANT IAN TILLEY'S OPPOSITION TO THE UNITED STATES'S AND
PLAINTIFF'S MOTIONS TO REMAND**

agency policy. *See* HRSA Federal Tort Claims Act Health Center Policy Manual at 7 (July 21, 2014) (evincing agency position that scope of project is an aspect of scope of employment).

There is no genuine dispute that Dr. Tilley performed medical functions on Eisner's behalf and within its HHS-approved federal project. It follows that his activities at CHMC were "grant-supported." The Government's contrary position ignores two inconvenient truths: (1) that HHS approved Eisner's detailed change in scope request, thereby adding CHMC (as a Form 5B service site) to Eisner's federal project, Freedus Decl. ¶ 4 Ex. C, and (2) that the Ninth Circuit rejected the agency's effort to remove the site (nearly a decade later). *Pediatric and Fam. Med. Found.*, 2021 WL 3878647, at *2. The point of Eisner's request to add CHMC to Eisner's federal project for prenatal and perinatal services was to ensure that services Eisner personnel provided at CHMC *would be* "grant-supported." *Cf.* HHS, HRSA, Health Center Program Compliance Manual, Chapter 17: Budget, 55 n.2, 62 n.2.

No surprise then that the Government identifies no evidence for its characterization of the alleged conduct as an "other line of business." U.S. Br. at 13. That phrase, in HHS parlance, is reserved for "activities that are *not* part of the HRSA-approved scope of project"—*i.e.*, where neither the cost nor revenue generated by the activity is "included in the annual budget for the Health Center Program project." HRSA, Health Center Program Compliance Manual, Chapter 17: Budget, at 63.

The Government likewise offers scant legal support for its preferred outcome. There is no value here in the truism that activities outside the scope of Section 330 are *not* eligible for "Health Center Program benefits (for example, payment as a FQHC under Medicare/Medicaid/CHIP, 340B Program eligibility, Federal Tort Claims Act (FTCA) coverage)." *Id.* at 63 n.6. Dr. Tilley seeks immunity from an action arising out of—rather than outside of—core Section 330 health center conduct: the provision of statutorily required services to an established Eisner

14

patient, at a health delivery site HHS expressly approved as part of Eisner's federal project. The Government's reliance on *Kelley v. Richford Health Ctr., Inc.*, 115 F.4th 132, 140 (2d Cir. 2024) fares no better. The *Kelley* decision not only conflicts with Ninth Circuit precedent, in that it (mis)uses § 233(g) to restrict the scope of § 233(a) immunity), but also is readily distinguishable because, unlike this case, the plaintiff "was never in fact a Health Center patient" (*i.e.*, he had no pre-existing relationship with the deemed defendants) and the service site (a skilled nursing facility) was not approved by HHS as a permanent delivery site. *Compare Kelley*, 115 F.4th at 140 (concluding § 233(g) "limits FTCA immunity to claims arising from medical services to patients of deemed entities" and "ties an entity's deemed federal employment to the patient/nonpatient status of the individual receiving treatment"); *with Friedenberg*, 68 F.4th 1127 ("Sections 233(g)(1)(B) and (C) were enacted to clear up such confusion ["on whether certain services would be covered, such as services provided to non-patients"], not to limit the protection afforded to deemed PHS employees."). In stark contrast, Plaintiff was a registered prenatal patient of Eisner (at the time of service) and CHMC was explicitly included (on Form 5B, for perinatal services) in Eisner's approved scope of project. Chapman Decl., Ex. A at 1; Freedus Decl., Ex. A, C.

### C. No Particularized Determination Was Required

The United States argues HHS's "final and binding" determination conferring federal employee status on Dr. Tilley should be ignored because Dr. Tilley "required a particularized determination for FTCA protections to apply" to his treatment of Plaintiff. U.S. Br. at 14. The Government is wrong on both the facts and the law. As to the facts, the Government insists Plaintiff was not an Eisner patient, while conceding "she received prenatal care at Eisner." *Id.* at 13. The record supplies the remaining key facts the Government ignores: Plaintiff received labor and delivery services from an Eisner provider at an approved Eisner service delivery site. ECF No. 1 (Notice of Removal); U.S. Br. at 1 (acknowledging Dr. Tilley's status as an

"employee of Eisner" at the time "Plaintiff was treated").

The Government's position on the law is deeply flawed for two reasons. First, the 1995 amendments to the FSHCAA require a single, advance deeming application for a prospective determination as to all activities for which coverage is sought, including any provision of services to non-patients. 42 U.S.C. §§ 233(g) and (h). A favorable determination is "final and binding" on the United States for the specified, prospective period. *Id*. § 233(g)(1)(F). The particularized determination process, which HHS conceived of to implement the FSHCAA of 1992 only, is plainly inconsistent with, and thus precluded by, the FSHCAA of 1995. For starters, the particularized determination process, which preceded the 1995 amendments, does not comport with their procedural protections—*i.e.*, a prompt and advance determination (within 30 days) for a specified calendar year that, if favorable, is "final and binding" *on Secretary and the Attorney General*. 42 U.S.C. § 233(g)(1)(F). Moreover, unlike the FSHCAA itself, with its mandated deeming application process, the FSHCAA regulation does not, as the Government contends, "require" a particularized determination. U.S. Br. at 11, 12 ("Eisner's 'arrangement' with the hospital *required* a particularized determination from HHS under 42 C.F.R. § 6.6(e)(4) for any care pursuant to the arrangement to be covered.") (emphasis added). Instead, the regulation uses permissive language: "the health center *should* seek a particularized determination of coverage" if it has any doubts as to coverage. 60 Fed. Reg. at 22531.

Second, even if legitimate, the particularized determination process, according to the agency that conceived of it, does not apply to or "address coverage arrangements concerning services provided to existing health center patients." HHS, HRSA, Federal Tort Claims Act: Health Center Policy Manual at 10, § C.4 ("HRSA/BPHC does not utilize particularized determinations to . . . address coverage arrangements concerning services provided to existing health center patients."). Because Plaintiff was an established prenatal patient of Eisner—with

16

1  inherent continuity of care needs—there is no basis for the government's contention
2  that Eisner "required a particularized determination for FTCA protections to apply."
3  U.S. Br. at 14.

4  **II.    Dr. Tilley Acted Under A Federal Officer Within The Meaning Of §**
5  **1442(A)(1) And Timely Removed Under § 1446(B)(3)**

6      The Ninth Circuit instructed that two issues related to Dr. Tilley's § 1442
7  removal be resolved on remand, *i.e.*, whether Dr. Tilley: (1) timely removed under
8  § 1446(b)(3); and (2) qualifies as a federal officer or person acting under a federal
9  officer within the meaning of § 1442(a)(1). The answer to both questions is yes.

10      First, as to timeliness, as the Ninth Circuit observed, the clock under
11  § 1446(b)(3) begins to run only on Dr. Tilley's receipt of a "paper from which it may
12  first be ascertained that the case is one which is or has become removable."
13  *Blumberger*, 115 F.4th at 1122. That paper must "make a ground for removal
14  unequivocally clear and certain" to trigger § 1446(b)(3)'s temporal limitation. *Id.*
15  (citing *Dietrich v. Boeing Co.*, 14 F.4th 1089, 1095 (9th Cir. 2021)). The statute does
16  not impose any duty of inquiry or investigation on Dr. Tilley where the initial
17  pleading or other document "is indeterminate with respect to removability." *Id.*
18  (citing *Kenny v. Wal-Mart Stores, Inc.*, 881 F.3d 786, 791 (9th Cir. 2018)). No record
19  evidence suggests that Dr. Tilley was subjectively aware of the notice of deeming
20  action until the case was removed. And even if he was, the notice provides limited
21  information against which to check the Government's insistence throughout these
22  proceedings, including in the pending motion to remand, that Dr. Tilley was *not*
23  deemed to be a PHS employee with respect to the acts and omissions alleged in
24  Plaintiff's complaint. Unlike Eisner's applications for federal funding, HHS's notice
25  of deeming action provides no indication of the sites, services, providers, service
26  area, or target populations included within Eisner's federal project. *Cf.* Deeming
27  Application. Accordingly, here, as in *Dietrich*, the removal was timely because no
28  ground for removal was unequivocally clear and certain to Dr. Tilley at any time

17

1   until the case was removed.

2       Second, Dr. Tilley qualifies as a person acting under a federal officer when

3   performing his duties as an Eisner physician employee. The Ninth Circuit, drawing

4   on Supreme Court precedent, considers four factors in its "acting under" analysis,

5   not all of which need be satisfied in every case: (1) working under an officer "in a

6   manner akin to an agency relationship"; (2) being "subject to the officer's close

7   direction, such as acting under the ... 'guidance, or control' of the officer" or having

8   an "unusually close" relationship "involving detailed regulation, monitoring, or

9   supervision"; (3) helping fulfill "basic governmental tasks"; and (4) conducting

10  activities "so closely related to the government's implementation of its federal duties

11  that the ... person faces 'a significant risk of state-court prejudice.'" *City & Cnty. of

12  Honolulu v. Sunoco LP*, 39 F.4th 1101, 1107 (9th Cir. 2022).

13      Contrary to the Government's assertions, the relationship between HHS and

14  health centers goes far beyond mere compliance with the law. *See Agyin*, 986 F.3d

15  at 177 ("Federal requirements associated with [health center] grants are

16  administratively burdensome and address all areas of operation.") (citing H.R. Rep.

17  No. 102-823(I) at 5)); *see also In re Joliet-Will Cnty. Cmty. Action Agency*, 847 F.2d

18  430, 432 (7th Cir. 1988) ("nature of the grantor-grantee relationship is such as to

19  constitute the grantee in effect an agent to carry out specified tasks"). As the Ninth

20  Circuit already concluded, Eisner's and Dr. Tilley's deemed federal employee

21  status—recorded in an HHS notice of deeming action—"provides unequivocally

22  clear and certain support for Dr. Tilley's contention that he was acting 'pursuant to

23  a federal officer's directions' when treating Blumberger and that there is a 'colorable

24  federal defense' pertaining to the medical malpractice claims." *Blumberger*, 115

25  F.4th at 1123. The availability of that status—and its delegation of the same legal

26  immunity that is extended to employees of the Public Health Service—evinces

27  Congress's recognition that health centers not only work under a high degree of HHS

28  control in their daily operations, but also assist the government in doing a job it

18

would otherwise perform itself: providing medical care to the indigent. *See Agyin*, 986 F.3d at 176, 77, 78.

Indeed, the federal government used to directly fulfill the role Eisner now serves, in part through the National Health Service Corps ("NHSC") and Congress's concurrent grant of authority to the HHS Secretary to "assign commissioned officers and other personnel of the Service to provide . . . health care and services for persons residing in [an area designated by the Secretary as having a critical health manpower shortage]." *See* Pub. L. No. 91-623, 84 Stat. 1870–71, § 2(a), (b) (1970) ("It shall be the function *of an identifiable administrative unit within the Service* to improve the delivery of health services to persons living in communities or areas of the United States where health personnel and services are inadequate to meet the health needs of the residents of such communities and areas.") (emphasis added). When considering the FSHCAA, Congress noted that, historically, more than one-half of health center staff were in the NHSC. H.R. Rep. No. 102-823(I), 5, 1992 U.S.C.C.A.N. 2627.[2]

In concluding that a deemed PHS physician was acting under a federal officer while providing medical care, the Second Circuit in *Agyin* further noted that the physician's federally-supported community health center employer was "subject to detailed requirements and oversight by the federal government" that—more than mere regulation—amount to "direct and detailed control of a federal agency or officer." *Agyin*, 986 F.3d at 177 (identifying indicia of such control, including through periodic "operational site visits . . . to verify compliance with the Health Center Program."). The same "administratively burdensome" "Federal requirements" "address[ing] all areas of operation" applicable in *Agyin* apply to

---

[2] Part of Congress's motivation for FSHCAA was to address increased costs incurred during the 9-year period when the majority of health center staff *were not* PHS employees. *See id.* (". . . the NHSC-assigned physicians lost their FTCA coverage, thus making malpractice costs a larger problem for the centers"). FSHCAA thus restored and extended the pre-existing FTCA protection by allowing health centers' employees to be deemed federal employees.

19

Eisner here. H.R. Rep. No. 102-823 (I), 5; *accord Agyin*, 986 F.3d at 176, 178.

Moreover, health center personnel are treated as HHS employees in other contexts. *See, e.g, Demers v. Buonanno*, 2012 WL 5930223, at *2 (D.R.I. Nov. 2, 2012) (United States removed state court subpoena for deposition testimony of a deemed PHS employee pursuant to 28 U.S.C. § 1442 and successfully moved to quash subpoena as testimony would "disrupt [deemed PHS employee's] official duties and not promote DHHS's objectives"), *report and recommendation adopted*, 2012 WL 5940568 (D.R.I Nov. 27, 2012) (Lisi, C.J.); 45 C.F.R. §§ 2.1(a), 2.2(4) (defining "Employee of the Department" to include "Employees and qualified contractors of an entity covered under the [FSHSCAA]" with respect to information acquired during the "performance of medical, surgical, dental or related functions" and characterizing deemed PHS employee functions as "official duties" or duties undertaken in an "official capacity with DHHS").

Finally, the Government's authorities present fundamentally different relationships than the one at issue here. *See* U.S. Br. at 17–18. Each provides a simple example of mere compliance with law. *Doe v. Cedars-Sinai Health Sys.*, 106 F.4th 907 (9th Cir. 2024), for example, involved meaningful use incentives, which were broadly applicable across the health care industry for compliance with the HITECH Act. In *Bulji v. Tyson Foods*, 22 F.4th 730 (8th Cir. 2021), the defendant meat processor acted sufficiently independently to have retained complete, independent discretion over the continuity of its operations during the COVID-19 pandemic. *Id.* at 741 (noting events at issue in suit predated the federal government's invocation of the Defense Production Act as applied to meat and poultry processing).

In contrast, the government dictates where Eisner can operate, who it must treat, the sort of treatment and services its personnel must provide, the manner in which it can charge for its services, how it must collect payment and from whom, how it must manage its finances and accounts, its relationships with contractors, and even the relationship it must maintain with other area providers. *See, e.g.*, 42 U.S.C.

§ 254b(b)(1) (enumerating required healthcare services), (b)(3)(authorizing HHS Secretary to designate geographic areas in which health centers may operate), (e)(5)(D) (mandating that all revenue generated by grant-supported activities be spent in furtherance of the grant project), (k)(2)(C) (authorizing HHS Secretary to require an assurance that the grantee provide "any health service . . . the Secretary finds is needed to meet specific health needs of the area to be served"), (k)(3)(B) (requiring centers to "make every reasonable effort to establish and maintain collaborative relationships with other health care providers"); (k)(3)(C) (requiring "ongoing quality improvement system . . . that maintains the confidentiality of patient records"); (k)(3)(D) (requiring centers demonstrate financial responsibility "by the use of such accounting procedures and other requirements as may be prescribed by the Secretary"); (k)(3)(E)–(F) (requiring centers to contract with federal payers); (k)(3)(G) (obligating centers to charge on an income-adjusted basis and treat all patients regardless of ability to pay). Simply put: as the Second Circuit concluded in *Agyin*, deemed PHS employees act under a federal officer within the meaning of § 1442(a)(1).

## CONCLUSION

For the foregoing reasons, the Court should deny the Government's and Plaintiff's motions to remand and order the substitution of the United States in place of Dr. Tilley.


May 23, 2025                                Respectfully submitted,

Jacob Rosenberg
LAW + BRANDMEYER LLP
385 E. Colorado Boulevard, Suite 200
Pasadena, CA 91101
626.243.5500
jrosenberg@lawbrandmeyer.com

21
**DEFENDANT IAN TILLEY'S OPPOSITION TO THE UNITED STATES'S AND PLAINTIFF'S MOTIONS TO REMAND**

1

2
                                        s/ *Matthew S. Freedus*

3                                       Matthew S. Freedus (admitted *pro hac vice*)
                                        POWERS PYLES SUTTER & VERVILLE, PC
4                                       1250 Connecticut Avenue, NW, Eighth Floor
                                        Washington, DC 20036
5                                       202.466.5660
                                        matthew.freedus@powerslaw.com
6

7                                       *Attorneys for Defendant Dr. Tilley*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEFENDANT IAN TILLEY'S OPPOSITION TO THE UNITED STATES'S AND
PLAINTIFF'S MOTIONS TO REMAND**

# L.R. 11-6.1 CERTIFICATION

The undersigned counsel of record for Defendant Dr. Tilley certifies that this brief contains 6912 words, which complies with the word limit of L.R. 11-6.1.

May 23, 2025                                          *s/ Matthew S. Freedus*
                                                     Matthew S. Freedus

**DEFENDANT IAN TILLEY'S OPPOSITION TO THE UNITED STATES'S AND PLAINTIFF'S MOTIONS TO REMAND**